<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Nos. 15-1465, 19-1024

---

SIERRA CLUB, *et al.*,
                                        *Petitioners*,
v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
                                        *Respondents*.

---

PETITION FOR REVIEW OF FINAL ADMINISTRATIVE ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

---

**PROOF OPENING BRIEF OF PETITIONERS**

Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2243
(202) 667-4500
sjohnson@earthjustice.org

**DATED:    July 22, 2019**          *Counsel for Petitioners*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| SIERRA CLUB, et al., )<br><br>*Petitioners*, )<br><br>v. )<br><br>U.S. ENVIRONMENTAL )<br>PROTECTION AGENCY, et al., )<br><br>*Respondents*. ) | Nos. 15-1465, 19-1024 |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners Sierra Club, Conservation Law Foundation, Downwinders at Risk, Physicians for Social Responsibility – Los Angeles, and National Parks Conservation Association submit this certificate as to parties, rulings, and related cases.

**(A) Parties and *Amici***

**(i) Parties, Intervenors, and *Amici* Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

**(ii) Parties to This Case**

Petitioners:

In No. 15-1465: Sierra Club, Conservation Law Foundation, Downwinders at Risk, and Physicians for Social Responsibility – Los Angeles.

In No. 19-1024: Downwinders at Risk, Sierra Club, and National Parks Conservation Association.

Respondents:

In both petitions: United States Environmental Protection Agency and Andrew Wheeler, in his official capacity as Administrator of the United States Environmental Protection Agency (collectively, "EPA").

Intervenors:

In No. 15-1465: none.

In No. 19-1024: Texas and the Texas Commission on Environmental Quality have been granted leave to intervene in support of Respondents.

**(iii) *Amici* in This Case**

None at present.

**(iv) Circuit Rule 26.1 Disclosures**

See disclosure statement filed herewith.

**(B) Rulings Under Review**

In No. 15-1465, Sierra Club, Conservation Law Foundation, Downwinders at Risk, and Physicians for Social Responsibility – Los Angeles seek review of an aspect of the final action taken by EPA at 80 FR 12,264 (Mar. 6, 2015) and titled "Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements." In No. 19-1024, Downwinders at Risk, Sierra Club, and National Parks Conservation Association seek review of the final action taken by EPA at 83 FR 62,998 (Dec. 6, 2018) and titled "Implementation of the 2015 National Ambient Air Quality Standards for Ozone: Nonattainment Area State Implementation Plan Requirements."

**(C) Related Cases**

Petitioners are not aware of any related cases not already consolidated in this matter.

DATED:     July 22, 2019                    Respectfully submitted,

/s/ Seth L. Johnson
Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2243
(202) 667-4500
sjohnson@earthjustice.org

*Counsel for Petitioners*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| SIERRA CLUB, et al.,<br><br>    *Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL<br>PROTECTION AGENCY, et al.,<br><br>    *Respondents*. | )<br>)<br>)<br>)<br>)<br>)   Nos. 15-1465, 19-1024<br>)<br>)<br>)<br>)<br>)<br>) |

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Sierra Club, Conservation Law Foundation, Downwinders at Risk, Physicians for Social Responsibility – Los Angeles, and National Parks Conservation Association make the following disclosures:

### Sierra Club

<u>Non-Governmental Corporate Party to this Action</u>: Sierra Club.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

# Conservation Law Foundation

<u>Non-Governmental Corporate Party to this Action</u>:  Conservation Law Foundation.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Conservation Law Foundation is a nongovernmental corporate entity headquartered in Boston, Massachusetts. It works on behalf of its New England-wide membership and with other environmental and community-based organizations and individuals to protect the public health and environment for the benefit of all people in New England.

# Downwinders at Risk

<u>Non-Governmental Corporate Party to this Action</u>: Downwinders at Risk.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Downwinders at Risk, a non-profit corporation organized and existing under the laws of the State of Texas, is a diverse grassroots citizens group dedicated to protecting public health and the environment from air pollution in North Texas.

# Physicians for Social Responsibility – Los Angeles

<u>Non-Governmental Corporate Party to this Action</u>:  Physicians for Social Responsibility – Los Angeles.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Physicians for Social Responsibility – Los Angeles, a corporation organized and existing under the laws of the State of California, is a California nonprofit organization dedicated to advocating for policies and practices that improve public health, eliminate environmental threats, and address health inequalities.

## National Parks Conservation Association

<u>Non-Governmental Corporate Party to this Action</u>: National Parks Conservation Association.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: National Parks Conservation Association, a non-profit corporation organized and existing under the laws of the District of Columbia, is a national organization dedicated to protecting and enhancing America's National Parks for present and future generations.

DATED:    July 22, 2019        Respectfully submitted,

/s/ Seth L. Johnson
Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2243
(202) 667-4500
sjohnson@earthjustice.org

*Counsel for Petitioners*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS .................................... x

PRELIMINARY STATEMENT .............................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 1

STATUTES AND REGULATIONS ......................................................... 2

STATEMENT OF ISSUES .................................................................. 2

STATEMENT OF THE CASE ............................................................... 4

I.    OZONE POLLUTION SERIOUSLY HARMS HUMAN HEALTH, AND THE CLEAN AIR ACT ESTABLISHES A COMPREHENSIVE APPROACH TO ADDRESS IT ........................................................................... 5

II.    EPA REPEATEDLY STRENGTHENS OZONE STANDARDS BUT OPENS LOOPHOLES IN POLLUTION-CONTROL REQUIREMENTS. .......... 10

    A.    Even as EPA revises the ozone standard three times to increase public health protections, the agency attempts to evade the Act's requirements. .......... 10

    B.    In the actions under review, EPA weakens pollution control requirements. ........................................................................ 12

        1.    EPA introduces the "interprecursor trading" loophole into the Act's protection against increased air pollution from new and modified power plants, refineries, and factories. ................................................... 12

        2.    EPA allows states to lessen requirements for emission reductions and evade accountability if they fall short. .......................................... 17

        3.    EPA waives the requirement for emission reduction measures that kick in if an area fails to make timely pollution reductions. ......................... 18

SUMMARY OF ARGUMENT .............................................................. 19

STANDARD OF REVIEW .................................................................. 22

STANDING ................................................................................... 23

ARGUMENT .................................................................................. 25

I.    INTERPRECURSOR TRADING IS ILLEGAL AND ARBITRARY. .......... 25

    A.    The Act unambiguously bars interprecursor trading. ................... 25

    B.    EPA provides no rational basis for authorizing interprecursor trading. ..... 29

    C.    EPA's rule illegally and arbitrarily allows pollution reductions from years ago to offset new emissions of a different pollutant today. ..................................32

    D.    EPA's authorization of interprecursor trading violates the Act's anti-backsliding provision and is arbitrary. ..................................................36

II.    EPA'S RULE UNLAWFULLY AND ARBITRARILY ALLOWS AREAS TO AVOID EMISSION REDUCTIONS REQUIRED BY THE ACT'S REASONABLE FURTHER PROGRESS PROVISIONS. ....................................38

    A.    EPA unlawfully and arbitrarily allows milestones to be deemed met even if the required "actual" emission reductions do not occur. .....................................39

    B.    EPA unlawfully and arbitrarily allows states to choose their own baseline year. .........................................................................47

III.    EPA UNLAWFULLY ALLOWS STATES TO RELY ON ALREADY-IMPLEMENTED CONTROLS AS CONTINGENCY MEASURES. ....................50

CONCLUSION .................................................................................54

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................56

CERTIFICATE OF SERVICE .............................................................57

ADDENDUM ..............................................................Separately Bound

    DECLARATIONS

    STATUTES AND REGULATIONS

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Am. Petroleum Inst. v. Costle*,
    665 F.2d 1176 (D.C. Cir. 1981).............................................................6

*Am. Trucking Ass'ns v. EPA*,
    283 F.3d 355 (D.C. Cir. 2002)........................................................... 5-6

*Ass'n of Battery Recyclers v. EPA*,
    716 F.3d 667 (D.C. Cir. 2013)............................................................30

*Ass'n of Private Sector Colleges v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012)............................................................36

\* *Bahr v. EPA*,
    836 F.3d 1218 (9th Cir. 2016), *cert. denied sub nom.*
    *Arizona v. Bahr*, 138 S. Ct. 635 (2018) ........................... 19, 50-52, 54

*Chevron U.S.A. v. NRDC*,
    467 U.S. 837 (1984)..............................................................22, 49, 54

*Clean Air Council v. Pruitt*,
    862 F.3d 1 (D.C. Cir. 2017)................................................................26

*Culbertson v. Berryhill*,
    139 S. Ct. 517 (2019).........................................................................25

*Davis County Solid Waste Mgmt. v. EPA*,
    108 F.3d 1454 (D.C. Cir. 1997)..........................................................54

*Del. Dep't of Natural Res. v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015)................................................................36

*Del. Dep't of Natural Res. v. EPA*,
    895 F.3d 90 (D.C. Cir. 2018)......................................................... 51-52

*Dodd v. United States*,
    545 U.S. 353 (2005).........................................................................51

\* Authorities upon which we chiefly rely are marked with an asterisk.

*Emera Maine v. FERC*,
    854 F.3d 9 (D.C. Cir. 2017)................................................................47

*Good Fortune Shipping v. Comm'r of Internal Revenue Serv.*,
    897 F.3d 256 (D.C. Cir. 2018)...................................................... 49-50

*In re Ozone Designation Litigation*,
    286 F. Supp. 3d 1082 (N.D. Cal. 2018)..............................................11

*La. Envtl. Action Network v. EPA*,
    382 F.3d 575 (5th Cir. 2004) ("*LEAN*") ................................. 19, 53-54

*Massachusetts v. DOT*,
    93 F.3d 890 (D.C. Cir. 1996)..............................................................22

*McFadden v. United States*,
    135 S. Ct. 2298 (2015)............................................................... 46-47

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................... 22-23

*Mountain Communic'ns v. FCC*,
    355 F.3d 644 (D.C. Cir. 2004)............................................................45

*Nat'l Parks Conserv. Ass'n v. Manson*,
    414 F.3d 1 (D.C. Cir. 2005)................................................................24

*Nat'l Treasury Employees Union v. Chertoff*,
    452 F.3d 839 (D.C. Cir. 2006)............................................................44

*New York v. EPA*,
    443 F.3d 880 (D.C. Cir. 2006)............................................................31

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008)............................................................31

\* *NRDC v. EPA*,
    571 F.3d 1245 (D.C. Cir. 2009)...................................... 10, 32-34, 37

*NRDC v. EPA*,
    643 F.3d 311 (D.C. Cir. 2011)..............................................4, 10, 23

*NRDC v. EPA*,
749 F.3d 1055 (D.C. Cir. 2014)..........................................................53

*NRDC v. EPA*,
777 F.3d 456 (D.C. Cir. 2014)..............................................10, 27, 48

*Nuclear Energy Inst. v. EPA*,
373 F.3d 1251 (D.C. Cir. 2004)..........................................................44

*People for the Ethical Treatment of Animals v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015)..........................................................24

*Performance Coal Co. v. Fed. Mine & Health Rev. Comm'n*,
642 F.3d 234 (D.C. Cir. 2011)............................................................54

*Rwy. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*,
29 F.3d 655 (D.C. Cir. 1994) (en banc)...............................................53

*Sierra Club v. EPA*,
294 F.3d 155 (D.C. Cir. 2002).......................................26-27, 31-32

*Sierra Club v. EPA*,
705 F.3d 458 (D.C. Cir. 2013)............................................................48

\* *South Coast Air Quality Mgmt. Dist. v. EPA*,
472 F.3d 882 (D.C. Cir. 2006)
("*South Coast I*") .................................... 7, 9, 10, 31, 32, 46, 48, 49, 53

*South Coast Air Quality Mgmt. Dist. v. EPA*,
489 F.3d 1245 (D.C. Cir. 2007)....................................................7, 54

\* *South Coast Air Quality Mgmt. Dist. v. EPA*,
882 F.3d 1138 (D.C. Cir. 2018) ("*South Coast II*") ..............9, 17, 37, 39, 47, 49

*State Farm Fire & Cas. v. United States*,
137 S. Ct. 436 (2016)........................................................................51

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996)......................................................23, 45

*United States v. Verrusio*,
762 F.3d 1 (D.C. Cir. 2014)................................................................52

v

*U.S. Sugar Corp. v. EPA*,
  830 F.3d 579, *amended in part on reh'g*, 844 F.3d 268 (D.C. Cir.
  2016) ................................................................................................ 35-36, 45, 47

*Utility Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014) .................................................................................52

*Vill. of Barrington v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) ..............................................................22

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)........................................................................ 6-8, 48

## STATUTES

5 U.S.C. § 706(2) ......................................................................................22

42 U.S.C. § 7407(d)(1)................................................................................6

42 U.S.C. § 7408(a) ....................................................................................6

42 U.S.C. § 7409(a) ....................................................................................6

42 U.S.C. § 7409(b) ....................................................................................6

42 U.S.C. § 7409(b)(1).................................................................................6

42 U.S.C. § 7409(d) .................................................................................6, 9

42 U.S.C. § 7409(d)(1)................................................................................9

42 U.S.C. § 7410(a) ....................................................................................7

42 U.S.C. § 7410(a)(1)............................................................................. 6-7

42 U.S.C. § 7410(c) ....................................................................................7

42 U.S.C. § 7412(b)(1)................................................................................6

42 U.S.C. § 7502 ........................................................................................7

42 U.S.C. § 7502(c)(5)..............................................................................12

\*42 U.S.C. § 7502(c)(9)......................................................................18, 50, 51

42 U.S.C. § 7502(e)..............................................................................1, 9, 37

42 U.S.C. § 7503.........................................................................................12

42 U.S.C. § 7503(c)(1) ...........................................................12, 27-29, 33, 34

42 U.S.C. § 7511-7511f ...........................................................................1, 7

42 U.S.C. § 7511(a)(1) ..................................................................................8

42 U.S.C. § 7511(a)(1) tbl.1..........................................................................8

42 U.S.C. § 7511(b)(1) ..................................................................................8

42 U.S.C. § 7511a ..........................................................................8, 29, 30

42 U.S.C. § 7511a(a) ..............................................................................18, 30

42 U.S.C. § 7511a(a)(2)(C)(i) ......................................................................13

42 U.S.C. § 7511a(a)(3)(A) ..........................................................................17

\*42 U.S.C. § 7511a(a)(4) ..............................................12-13, 25, 28, 29

42 U.S.C. § 7511a(b)(1) ................................................................................17

42 U.S.C. § 7511a(b)(1)(A)(i) ...............................................................38-40

42 U.S.C. § 7511a(b)(1)(B)..............................................................38-40, 47-48

42 U.S.C. § 7511a(b)(5) ............................................................12, 13, 25, 29

42 U.S.C. § 7511a(c) ....................................................................................12

42 U.S.C. § 7511a(c)(2)(B)................................................................17, 26, 39, 40

42 U.S.C. § 7511a(c)(2)(C)..............................................................17, 26, 31, 39

\*42 U.S.C. § 7511a(c)(9) ...................................................................18, 50, 51

42 U.S.C. § 7511a(c)(10)................................................................12, 25, 29

42 U.S.C. § 7511a(d) ....................................................................................12

vii

42 U.S.C. § 7511a(d)(2) ................................................................12, 25, 29

42 U.S.C. § 7511a(e) .........................................................................12, 30

42 U.S.C. § 7511a(e)(1) ..............................................................12, 25, 29

42 U.S.C. § 7511a(e)(5)(B) ...............................................................50, 51

42 U.S.C. § 7511a(f)(1) .........................................................13, 26, 29, 30

42 U.S.C. § 7511a(g) .........................................................................12, 39

42 U.S.C. § 7511a(g)(1) ...........................................................................17

42 U.S.C. § 7511a(g)(2) ...........................................................................17

42 U.S.C. § 7511a(g)(3) ...........................................................................17

42 U.S.C. § 7511a(g)(4) ...........................................................................17

42 U.S.C. § 7511a(g)(5) ...........................................................................17

42 U.S.C. § 7511a(i) .................................................................................17

42 U.S.C. § 7511d(b)(2) ...........................................................................48

42 U.S.C. § 7513a(c)(1) ...........................................................................46

42 U.S.C. § 7601(a)(1) ...............................................................................1

42 U.S.C. § 7602(g) .........................................................................12, 27-28

42 U.S.C. § 7602(j) .........................................................................12, 13

42 U.S.C. § 7607(b)(1) ...............................................................................1

## REGULATIONS

40 C.F.R. § 50.10 .....................................................................................10

40 C.F.R. § 51.100(s) .................................................................................6

**LEGISLATIVE HISTORY**

1 A Legislative History of the Clean Air Act Amendments of 1990 (1993) .... 42-43

H.R. Rep. No. 101-490 pt.1 (1990),
  *reprinted in* 2 A Legislative History of the Clean Air Act
  Amendments of 1990 (1993) ...................................................................... 42-43


**FEDERAL REGISTER NOTICES**

57 FR 13,498 (Apr. 16, 1992) .................................................................... 44

69 FR 23,951 (Apr. 30, 2004) ...................................................................... 9

73 FR 16,436 (Mar. 27, 2008) .................................................................... 10

77 FR 30,088 (May 21, 2012) ..................................................................... 10

80 FR 12,264 (Mar. 6, 2015) ......................................... 1, 10-11, 13, 17, 36

80 FR 65,292 (Oct. 26, 2015) ............................................................... 5, 11

81 FR 81,276 (Nov. 17, 2016) ............................................................. 36, 46

82 FR 29,246 (June 28, 2017) ..................................................................... 11

83 FR 17,226 (Apr. 18, 2018) ...................................................................... 6

83 FR 49,297 (Oct. 1, 2018) ...................................................................... 52

83 FR 62,998 (Dec. 6, 2018)... 1, 11, 14, 15, 18, 19, 29-31, 37-40, 44, 46-49, 52, 53


**OTHER AUTHORITIES**

*American Heritage College Dictionary* (3d ed. 1997) ............................................ 33

*Black's Law Dictionary* (6th ed. 1990) ............................................................. 33, 51

*Webster's New Universal Unabridged Dictionary*
  (deluxe 2d ed. 1983) ............................................................................. 51

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| 2015 Implementation Rule or 2015 Rule | 80 FR 12,264 (Mar. 6, 2015) |
| 2018 Implementation Rule or 2018 Rule | 83 FR 62,998 (Dec. 6, 2018) |
| Comments | EPA-HQ-OAR-2016-0202-0118 |
| Dkt | EPA-HQ-OAR-2016-0202 |
| EPA | Respondents U.S. Environmental Protection Agency and Administrator Andrew Wheeler |
| Guidance | EPA-HQ-OAR-2016-0202-0132 attach. |
| Inspector General Report | EPA-HQ-OAR-2003-0079-0849 |
| $NO_X$ | Oxides of nitrogen |
| ppm | Parts per million |
| Response to Comments | EPA-HQ-OAR-2016-0202-0133 |
| VOCs | Volatile organic compounds |

## PRELIMINARY STATEMENT

This case marks the latest in a multi-decade series reviewing EPA's attempts to insert extra-statutory loopholes into the implementation of health-protective standards for ozone—smog—pollution. These loopholes depart from the plain language of the Clean Air Act ("the Act"), and from what this Court found the clear intent of Congress to be when it comprehensively revamped the Act's ozone implementation provisions: to limit discretion and instead to ensure pollution reductions actually occur. EPA's illegal and arbitrary actions allow more pollution for longer, harming public health and the environment.

## JURISDICTIONAL STATEMENT

**Agency.** Respondents U.S. Environmental Protection Agency and Andrew Wheeler, Administrator, (collectively, "EPA" or "the agency") have jurisdiction to issue rules implementing the Act. 42 U.S.C. §§ 7502(e), 7511-7511f, 7601(a)(1).

**Court.** Under 42 U.S.C. § 7607(b)(1), this Court has jurisdiction to review the final EPA actions, taken at 80 FR 12,264 (Mar. 6, 2015), JA____, and 83 FR 62,998 (Dec. 6, 2018), JA____, challenged in this proceeding.

**Timeliness.** The petitions for review were timely filed within the Act's 60-day window, 42 U.S.C. § 7607(b)(1). No. 15-1465 consists of an issue severed from case No. 15-1123, which sought review of 80 FR 12,264, JA____, and was filed on May 5, 2015. Seeking review of 83 FR 62,998, JA____, No. 19-1024 was

filed on February 4, 2019. The Court granted an unopposed motion to consolidate the cases.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in an addendum to this brief.

## STATEMENT OF ISSUES

1. Under the Act, an entity seeking to construct or modify a major stationary source within an ozone nonattainment area must obtain reductions in pollution ("offsets") of varying degrees for each ozone-forming pollutant ("precursor") that will be emitted to offset the increased emissions of each "such air pollutant." Did EPA unlawfully and arbitrarily authorize interpollutant or interprecursor trading to satisfy offset requirements for construction of new or modified major sources in ozone nonattainment areas?

2. The Act's detailed framework for attaining health-protective ozone standards requires certain ozone nonattainment areas to make "reasonable further progress" toward attainment by reducing their actual emissions of ozone-forming pollutants from anthropogenic sources by given percentages over various multi-year periods. The required reductions are measured from emission levels in a "baseline year," and, in certain areas, each required

reduction in actual emissions over a multi-year period is called a "milestone." The Act further requires these nonattainment areas to demonstrate they met their milestones or else implement measures to reduce emissions more.

    a. Did EPA unlawfully and arbitrarily allow ozone nonattainment areas to claim they have met their milestones by showing only that they have implemented controls that were previously predicted to accomplish the required reductions, without regard to whether actual emissions in the area went down by the required amount?

    b. Did EPA unlawfully and arbitrarily claim discretion to allow states to choose their own baseline year, thus allowing states to minimize or even avoid having to make the required reductions?

3. The Act requires that ozone nonattainment areas adopt "contingency measures" that are to take effect automatically if the area fails to meet its reasonable further progress milestones or fails to attain the standard by its attainment deadline. Did EPA unlawfully allow nonattainment areas to meet the contingency measure requirement by identifying measures that will already have been implemented at the time of a failure to meet a milestone or attain the standard?

## STATEMENT OF THE CASE

In the actions under review, EPA again allowed communities with harmful levels of ozone pollution to depart from the detailed, clear steps Congress required them to take to come into compliance with health standards. *See, e.g.*, *NRDC v. EPA*, 643 F.3d 311, 323 (D.C. Cir. 2011) ("concluding that EPA has once again failed to heed the restrictions on its discretion set forth in the Clean Air Act," and reiterating that EPA "must obey the Clean Air Act as written by Congress and interpreted by this court" (cleaned up)). Though the Act requires large industrial facilities seeking to increase emissions of an ozone-forming pollutant to <u>reduce</u> the overall amount of that pollutant emitted in the area, EPA created an "interprecursor trading" loophole under which such pollution can increase. EPA further allowed states to game the reasonable further progress requirements, under which polluted areas are supposed to reduce overall emissions of ozone-forming pollution by set percentages through the multi-year implementation process. Under EPA's rule, states can choose their own "baseline year," or starting point, which allows them to choose one that leads to an easier end target, and they don't have to show the required emission reductions actually occurred, as the statute requires for "milestone compliance demonstrations." And EPA vitiated the Act's requirement for "contingency measures" that kick in automatically if an area fails to meet its

progress requirements or to timely attain; instead, such measures can be ones that were implemented years ago and failed to result in timely progress or attainment.

Overall, EPA's actions transform Congress's health-protective requirements for assured, certain emission reductions into opportunities for emission increases, and defang key accountability measures Congress designed to ensure pollution reductions necessary to protect public health occur in the real world, rather than just on paper.

## I.     OZONE POLLUTION SERIOUSLY HARMS HUMAN HEALTH, AND THE CLEAN AIR ACT ESTABLISHES A COMPREHENSIVE APPROACH TO ADDRESS IT.

Ozone, the main component of urban smog, is a corrosive air pollutant that inflames the lungs, constricts breathing, causes asthma attacks and other health harms serious enough to send people to the emergency room or hospital, and can cause death. *See Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 359 (D.C. Cir. 2002); 80 FR 65,292, 65,306/1-09/1 (Oct. 26, 2015), JA____-__; EPA-HQ-OAR-2008-0699-0404 at 3-18, 3-26 to -29, 3-32, JA____, ____-__, ____; EPA-HQ-OAR-2008-0699-0405 at 2-16 to -18, 2-20 to -24 tbl.2-1, JA____-__, ____-__. Ozone is not emitted directly into the atmosphere, but results from the reaction of precursor chemicals—primarily volatile organic compounds ("VOCs") and oxides of nitrogen ("NO$_X$")—with sunlight in the atmosphere. *Am. Trucking*, 283 F.3d at 359. Volatile organic compounds and oxides of nitrogen are themselves harmful

air pollutants; for example, volatile organic compounds include listed hazardous air pollutants like benzene, toluene, and formaldehyde,[1] and oxides of nitrogen cause similar respiratory problems as ozone.[2] Cars, power plants, and factories are among the primary sources of these precursors. *Am. Trucking*, 283 F.3d at 359; *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1181 (D.C. Cir. 1981).

The Clean Air Act requires EPA to set and periodically revise national ambient air quality standards ("standards") for pollutants like ozone, to protect public health and welfare. 42 U.S.C. §§ 7408(a), 7409(a)-(b), (d). Primary standards (at issue here) must be set at a level "requisite to protect the public health," "allowing an adequate margin of safety." *Id.* § 7409(b)(1); *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475-76 (2001).

After promulgating a standard, EPA must "designate" regions of states as either violating the standard ("nonattainment" areas) or meeting the standard ("attainment" areas). 42 U.S.C. § 7407(d)(1). Each state must adopt a "state

---

[1] *See* 40 C.F.R. § 51.100(s) (defining volatile organic compound as "any compound of carbon, excluding [certain compounds], which participates in atmospheric photochemical reactions"); EPA, *Technical Overview of Volatile Organic Compounds*, http://www.epa.gov/indoor-air-quality-iaq/technical-overview-volatile-organic-compounds (discussing benzene, formaldehyde, and toluene as example volatile organic compounds), JA____; 42 U.S.C. § 7412(b)(1) (listing all three compounds as hazardous air pollutants).

[2] *See, e.g.*, 83 FR 17,226, 17,233/3-35/2 (Apr. 18, 2018), JA____-__.

implementation plan" that "provides for implementation, maintenance, and enforcement" of a newly promulgated or revised standard. *Id.* § 7410(a)(1). For nonattainment areas, Congress created a detailed program to ensure that air quality will attain ozone standards by specified deadlines ("attainment deadlines"). *Id.* §§ 7410(a), (c), 7502; *see also id.* §§ 7511-7511f (provisions specific to ozone nonattainment areas).

For two decades, beginning in 1970, the Act took a "discretion-filled approach" toward implementing air quality standards in nonattainment areas, including those for ozone. *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 887 (D.C. Cir. 2006) ("*South Coast I*"), *amended in other parts*, 489 F.3d 1245 (D.C. Cir. 2007). The approach was ineffectual: The ozone pollution problem was actually <u>worsening</u> in the late 1980s. *Id.* 886-87. Thus, in 1990, Congress amended Part D of Title I of the Act to limit EPA's discretion and more effectively curb ozone pollution. *Whitman*, 531 U.S. at 484-85; *South Coast I*, 472 F.3d at 887-88. The new, "comprehensive regulatory requirements of Subpart 2" of Part D then took control of implementation of the ozone standard in nonattainment areas. *South Coast I*, 472 F.3d at 892; *see also* 42 U.S.C. §§ 7511-7511f (Subpart 2). Congress intended Subpart 2 to control implementation well into the future, regardless of whether EPA revised the then-governing ozone standard. *Whitman*, 531 U.S. at 485-86.

At the time of the 1990 Amendments, the ozone health standard dated from 1979 and limited 1-hour average ozone levels ("1-hour standard"). Attainment deadlines and control requirements were determined by the severity and persistence of violations of that standard. *See* 42 U.S.C. §§ 7511(a)(1) tbl.1, 7511a. In 1997, EPA adopted an 8-hour ozone standard and tried to exempt that new standard from the requirements and timetables in Subpart 2, an attempt the Supreme Court rejected. *Whitman*, 531 U.S. at 483-84. The Court held EPA had limited authority to adapt Subpart 2 to a new standard, but could not "render Subpart 2's carefully designed restrictions on EPA discretion utterly nugatory once a new standard has been promulgated." *Id.* 484.

Among other things, Subpart 2 provides that ozone nonattainment areas be classified as "marginal," "moderate," "serious," "severe," or "extreme" based on how far out of attainment they are. 42 U.S.C. § 7511(a)(1) tbl.1. These classifications and corresponding attainment deadlines are set out in the text of Subpart 2. *Id.* § 7511(a)(1) & tbl.1; *see also id.* § 7511(b)(1) (areas redesignated nonattainment "shall…be classified by operation of law in accordance with" § 7511(a)(1) tbl.1).

Some pollution controls apply to all nonattainment areas, but the classifications determine many control requirements' applicability and stringency. "Areas with greater problems were given more time to attain the [standard] but a

harsher set of mandatory controls, including provisions for demonstrations of reasonable further progress, $NO_X$ control, motor vehicle emissions control, and new source review." *South Coast I*, 472 F.3d at 887. Controls relevant to the instant case are summarized in the subsequent section.

EPA must review and, as appropriate, revise ozone standards every five years. 42 U.S.C. § 7409(d)(1). In 2004, after revising the ozone standard in 1997, EPA chose to "revoke" the prior one. *South Coast I*, 472 F.3d at 898. This Court held that when EPA revokes a standard, it must protect against "backsliding" in areas that are nonattainment under that standard. *Id.* 899. The Act requires EPA to adopt rules ensuring that areas designated nonattainment under a revoked primary standard remain subject to "controls which are not less stringent" than the controls applicable to areas designated nonattainment before the revocation.[3] 42 U.S.C. § 7502(e); *see, e.g.*, *South Coast I*, 472 F.3d at 900.

---

[3] Although § 7502(e) requires EPA to prevent backsliding when it "relaxes" a standard, EPA has concluded the same anti-backsliding principles apply when EPA strengthens and revokes a standard. *South Coast I*, 472 F.3d at 900; *see* 69 FR 23,951, 23,972/2-3 (Apr. 30, 2004) (adopting interpretation), JA____; *South Coast Air Quality Mgmt. Dist. v. EPA*, 882 F.3d 1138, 1147 (D.C. Cir. 2018) ("*South Coast II*") (applying § 7502(e) to transition from weaker to stronger ozone standard).

## II. EPA REPEATEDLY STRENGTHENS OZONE STANDARDS BUT OPENS LOOPHOLES IN POLLUTION-CONTROL REQUIREMENTS.

### A. Even as EPA revises the ozone standard three times to increase public health protections, the agency attempts to evade the Act's requirements.

Based on evidence showing ozone was more dangerous than previously thought, EPA revised the 1979 1-hour standard in 1997, adopting an 8-hour standard of 0.084 parts per million ("ppm") to provide additional health protection. 40 C.F.R. § 50.10. EPA eventually promulgated implementation rules for that standard, partially under Subpart 2, which this Court upheld and rejected in part. This Court upheld EPA's revocation of the 1-hour standard, but rejected as unlawful backsliding EPA's attempt to eliminate or weaken various control requirements. *See NRDC v. EPA*, 571 F.3d 1245, 1271 (D.C. Cir. 2009); *South Coast I*, 472 F.3d at 899-905; *see also NRDC*, 643 F.3d at 322-23.

In 2008, EPA determined that the 1997 standard was also inadequate to protect public health in light of new scientific evidence and promulgated a new ozone standard, setting the level, again measured as an 8-hour average concentration, at 0.075 ppm. 73 FR 16,436 (Mar. 27, 2008). Implementation of the 2008 standard began in 2012. *E.g.*, 77 FR 30,088 (May 21, 2012); *see also NRDC v. EPA*, 777 F.3d 456 (D.C. Cir. 2014) (vacating EPA efforts to extend attainment deadlines and waive certain protection). EPA revoked the 1997 standard in 2015, promulgating a rule governing the transition from the earlier standards to the 2008

standard and implementing the 2008 standard, 80 FR 12,264 ("2015

Implementation Rule" or "2015 Rule"), JA____.

In 2015, EPA also strengthened the ozone standard to a level of 0.070 ppm,

measured as an 8-hour average, for, again, new evidence showed that the prior

standard was inadequate to protect public health. 80 FR 65,292. EPA initially

delayed implementation of the 2015 standard, noting that it was working "to

develop additional flexibilities for states to comply with the ozone standard," 82

FR 29,246, 29,247/2 (June 28, 2017), JA____, but was compelled to promulgate

nonattainment designations and began implementation. *See American Lung Ass'n*

*v. EPA*, No. 17-1172 (D.C. Cir. filed July 12, 2017); *In re Ozone Designation*

*Litigation*, 286 F. Supp. 3d 1082 (N.D. Cal. 2018). Accordingly, in 2018, EPA

promulgated a rule governing the 2015 standard's implementation. 83 FR 62,998

("2018 Implementation Rule" or "2018 Rule"), JA____.[4] That is the EPA action

principally at issue herein.

---

[4] EPA did not revoke the 2008 standard. *Id.* 63,000/1-2, JA____.

**B. In the actions under review, EPA weakens pollution control requirements.**

    **1. EPA introduces the "interprecursor trading" loophole into the Act's protection against increased air pollution from new and modified power plants, refineries, and factories.**

All ozone nonattainment areas must adopt "new source review" permitting programs governing construction and modification of major factories, refineries, and power plants. 42 U.S.C. §§ 7502(c)(5), 7503. These permitting programs must require such sources to install state-of-the-art emission controls and to compensate for emission increases with greater offsetting reductions, with a wider range of new sources subject to the requirements as "major sources" and greater offsetting reductions required in areas with higher ozone classifications. *Id.* §§ 7503, 7511a(a)(4), (b)(5), (c), (c)(10), (d), (d)(2), (e), (e)(1), 7602(j). The Act's general provisions for nonattainment areas mandate that a source subject to new source review comply with the offset requirement for "any air pollutant…by obtaining reductions of such air pollutant" and that the "increased emissions of the air pollutant" "be offset by an equal or greater reduction…in the actual emissions of such air pollutant."[5] *Id.* § 7503(c)(1). For each classification, Subpart 2 expressly

---

[5] The Act defines "air pollutant" to cover "precursors to the formation of any air pollutant"—chemicals that produce a particular pollutant—when EPA has identified such precursors. *Id.* § 7602(g). As ozone is not emitted directly, the offset requirement applies to emissions of the pollutants that form ozone.

specifies the minimum offset "ratio of total emission reductions of volatile organic compounds to total increased emissions of such air pollutant." *Id.* § 7511a(a)(4); *accord, e.g.*, *id.* § 7511a(b)(5). Subpart 2 extends that volatile organic compound-specific mandate to emissions of oxides of nitrogen from major sources. *See id.* § 7511a(f)(1).

The 2015 Rule amended EPA's prior regulations governing new source review to allow new and modified stationary sources of ozone-forming pollutants to meet their emission offset requirements for one of the ozone-forming pollutants with reductions of emissions of the other pollutant. 80 FR 12,288/3-89/2, JA____-__. This cross-precursor offsetting is called "interprecursor trading."[6]

A hypothetical example of how interprecursor trading works follows. Take a proposed source in a marginal area with the potential to emit 100 tons per year of volatile organic compounds. This source is "major," and thus subject to new source review. 42 U.S.C. §§ 7511a(a)(2)(C)(i), 7602(j). The minimum offset ratio in a marginal area is 1.1:1, meaning that the proposed source with a potential to emit 100 tons must obtain at least 110 tons of reductions in emissions of volatile organic compounds from existing sources in the same nonattainment area. *See id.* § 7511a(a)(4). Under interprecursor trading, the state or source could use computer

_____

[6] As used herein, unless context indicates otherwise, "interprecursor trading" refers only to interprecursor trading of ozone-forming chemicals.

simulations to estimate how much 110 tons of reduction in volatile organic compound emissions reduces ozone levels in the area, compare it against how much reduction in oxides of nitrogen emissions is estimated necessary to produce the same effect, and calculate a trading ratio to purportedly "ensure that the substitution of one ozone precursor for another in an offset transaction provides an equivalent or greater air quality benefit with respect to ground level ozone." 83 FR 63,016/2 n.39, JA____. This trading ratio is almost certain to vary over time, from area to area, and even from source to source. *See id.* 63,019/1-3, JA____; Dkt[7]-0132 attach. ("Guidance") 3 ("[Ozone] formation regimes vary across most areas due to the different mix of $NO_X$ and VOC sources and also in time, meaning the precursors limiting [ozone] formation can vary from day to day or even hour to hour in a given area."), JA____.

The source could then rely on the trading ratio and obtain emission offsets not as emissions of volatile organic compounds but as emissions of oxides of nitrogen. Say the calculation purports to show that reduction of one ton of oxides of nitrogen emissions has at least the same effect on ozone levels as reduction of one ton of volatile organic compound emissions. Then the trading ratio would be 1:1, and the hypothetical proposed source above could obtain 110 tons of oxides of

---

[7] All "Dkt" references are to document numbers in EPA docket EPA-HQ-OAR-2016-0202 (e.g., "Dkt-0132" means EPA-HQ-OAR-2016-0202-0132).

nitrogen emission offsets instead of 110 tons of volatile organic compounds

offsets. The ratio might be 2:1 instead, in which case 220 tons of oxides of nitrogen

emission offsets would be necessary. Or the ratio could be 1:2, which would mean

the offset requirement would be just 55 tons of oxides of nitrogen emissions. *See*

Dkt-0133 ("Response to Comments") 197 (ratio below 1:1 is not barred), JA____.

    Because EPA had not proposed to amend its regulations to allow

interprecursor trading, in addition to seeking judicial review of the 2015 Rule,

certain parties to litigation over the 2015 Rule petitioned EPA for administrative

reconsideration of this issue under § 7607(d)(7)(B). EPA-HQ-OAR-2010-0885-

0193, JA____. EPA granted the administrative petition. Letter from Janet G.

McCabe, Acting Assistant Admin'r, EPA, to David S. Baron, Earthjustice (Nov. 5,

2015), JA____. With all parties' agreement, this Court then severed and abated the

challenge to interprecursor trading from the litigation. Order, *South Coast Air*

*Quality Mgmt. Dist. v. EPA*, No. 15-1115 (D.C. Cir. Dec. 18, 2018, #1589450).

    Completing its administrative reconsideration process in the 2018 Rule, EPA

affirmed its decision in the 2015 Rule to authorize interprecursor trading. 83 FR

63,016/1, 63,017/2-18/2, JA____-__. The agency contended that the Act was

ambiguous about the legality of interprecursor trading and noted the 2018 Rule

"attempts to strike a balance between providing flexibility for the offset

requirement in [new source review] permitting and compliance with the [Act]'s air

quality protections." *Id.* 63,017/2-21/3, JA____-__. It also agreed that, under interprecursor trading, a state could allow increased emissions to be greater than the offsetting reductions. Response to Comments 197, JA____. EPA further allowed the offsetting reductions to have occurred even decades ago. *See id.* 213, JA____. By authorizing interprecursor trading, EPA allows sources to escape the emission reduction requirements Congress mandated. They can substantially increase their emissions of one independently harmful air pollutant in favor even of lesser reductions in emissions of a different one, so long as they hypothesize that, notwithstanding the intense variability in ozone formation, the tradeoff will somehow result in the same level of ozone reduction.

This scheme eliminates the assured offset of actual, real world emissions by the greater actual, real world pollution cuts that Congress expressly mandated. EPA even touts how it loosened oversight it had proposed to exercise over states' use of interprecursor trading in favor of "encourage[ments]" from EPA for states to "consult" with it and "flexibility" for states and pollution sources. *Id.* 193-94, JA____-__. Thus, EPA will let pollution increase based on uncertain estimates that cuts in a different pollutant might lead to the same air quality benefit. People exposed to pollution from these sources will thus be denied the certainty of reduced overall emissions that Congress promised.

## 2. EPA allows states to lessen requirements for emission reductions and evade accountability if they fall short.

In moderate and higher areas, Congress required minimum percentage reductions, compared to emissions in a specified "baseline" year, in actual emissions of volatile organic compounds (and, in some circumstances, oxides of nitrogen) averaged over first a six-year and then three-year periods until attainment (the "reasonable further progress" requirements). 42 U.S.C. § 7511a(b)(1), (c)(2)(B)-(C). Serious and higher areas must demonstrate that they met the "milestones" of actual emission reductions established by the six-year and subsequent three-year requirements. *Id.* § 7511a(g)(1)-(2). If an area fails to submit a demonstration or has its demonstration rejected by EPA, it must undertake additional emission reductions. *Id.* § 7511a(g)(3)-(5).

The 2015 Implementation Rule allowed states to select their baseline year for the progress requirements from a range of years, with the default being the year of the most recent periodic emission inventory that the Act requires be submitted at least every three years. 80 FR 12,272/1-73/2, JA____-__; *see* 42 U.S.C. § 7511a(a)(3)(A). This Court agreed with EPA that the Act was ambiguous about what the baseline year is and that the emission inventory cycle was a reasonable, statutorily-grounded basis for setting it, but vacated the option for states to choose their own baseline because it had "no statutory basis." *South Coast Air Quality Mgmt. Dist. v. EPA*, 882 F.3d 1138, 1152-53 (D.C. Cir. 2018) ("*South Coast II*").

EPA took two actions in the 2018 Rule that allow higher emission levels than the Act does. First, EPA again allowed areas to pick their own baseline year for the progress requirements, once more opening the door to an area's selecting a year that results in a higher (less protective) ending level of emissions. 83 FR 63,005/2-3, JA____. Second, for the first time ever, EPA established regulations defining how serious and higher areas demonstrate compliance with their milestones. *Id.* 63,011/1-12/2, JA____-__. But, rather than require such areas to show <u>actual</u> emissions decreased by the required amounts, EPA instead allowed them to merely rely on estimates of emission reductions postulated to occur due to control measures. *Id.* 63,011/3-12/1, JA____-__. As a result, when an area's controls prove less effective than projected, or its uncontrolled emission growth expands more than assumed, the milestone compliance requirements will not be triggered to keep the area on track to timely attainment.

### 3. EPA waives the requirement for emission reduction measures that kick in if an area fails to make timely pollution reductions.

Moderate and higher areas must adopt "contingency measures" that apply automatically in the event that the area fails to meet its reasonable further progress milestones or to attain by its attainment deadline. 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9); *see also id.* § 7511a(a) (§ 7502(c)(9) "shall not apply to Marginal Areas"). The 9th Circuit recently held these measures must be truly contingent—

measures that have not already been implemented and proven inadequate to deliver the required air quality improvements. *Bahr v. EPA*, 836 F.3d 1218, 1235-37 (9th Cir. 2016), *cert. denied sub nom. Arizona v. Bahr*, 138 S. Ct. 635 (2018). By contrast, the 5th Circuit has said that contingency measures may lawfully include measures that have been already implemented. *La. Envtl. Action Network v. EPA*, 382 F.3d 575, 582-84 (5th Cir. 2004) ("*LEAN*").

EPA refused in the 2018 Rule to give teeth to the contingency measures requirement. Acknowledging the 9th Circuit's decision in *Bahr*, 836 F.3d at 1235-37, and acquiescing to it in states within that Circuit, EPA declined to follow it more broadly. 83 FR 63,026/1-3, JA____. Instead, the agency announced that, outside the 9th Circuit, it would follow *LEAN* and allow nonattainment areas to use as "contingency measures" "already-implemented reductions." *Id.* 63,026/3, JA____. As a result, outside the 9th Circuit's states, when an area fails to make emission reduction progress or to attain timely, no new emission reductions need go into effect automatically.

## SUMMARY OF ARGUMENT

Interprecursor Trading. EPA's rules contravene the Act by allowing new and modified factories, power plants, and refineries to increase their emissions of one dangerous ozone-forming pollutant without obtaining greater offsetting emission reductions of the same pollutant. But the Act unambiguously requires increased

emissions of "volatile organic compounds" be offset by greater emission reductions of "such air pollutant." The Act separately extends that requirement to increased emissions of oxides of nitrogen, confirming that Congress intended increased emissions of each precursor to be offset by greater reductions in emissions of the same precursor. Moreover, under EPA's rules, a source can offset increased emissions of one precursor with <u>fewer</u> emissions of the other—thus abrogating the Act's express requirement that offsets must consist of "an <u>equal or greater reduction</u>...in actual emissions."

EPA's justifications for interprecursor trading lack merit. Indeed, EPA itself admits that it sought to "balance" "compliance with the [Act]'s air quality protections" and "flexibility for the offset requirement." EPA has no authority to balance statutory compliance against any other factor. Moreover, EPA's justifications are inconsistent with the express statutory text and turn ordinary canons of statutory interpretation on their head.

By allowing sources to claim credit for emission reductions of a different pollutant that happened long ago—even decades ago—EPA violates the plain language of the Act that requires offsets to be reductions in "actual"—currently existing, real—"emissions." EPA further failed to rationally respond to comments and explain how these past emission reductions of one precursor can yield greater ozone reduction benefits than new reductions of a different one today.

Because EPA amended its regulations to authorize interprecursor trading when it revoked the 1997 standard, EPA had to comply with the Act's anti-backsliding provision. But interprecursor trading renders protections less stringent than before—unlawful backsliding. And EPA nowhere explains how amending its regulations to allow interprecursor trading accords with the bar on backsliding.

Progress Requirements. Though the Act's milestones must be measured as decreases in "actual" emissions, EPA allows areas to demonstrate compliance without showing such a decrease. But only analyses of actual emissions can demonstrate compliance with the milestones. Otherwise, flawed assumptions about how effective controls will be or how much growth a nonattainment area will experience will go unchecked. That lack of verification cannot be reconciled with Congress's design of the milestone program to determine whether envisioned emission reductions actually occur and to ensure corrective measures go swiftly into effect if an area is falling behind. EPA does not rationally justify its inadequate alternative.

The Act bars EPA's decision to authorize areas to choose their own baseline year, a decision that allows gaming of the progress requirements. Indeed, this Court vacated EPA's action in the 2015 Rule authorizing areas to so choose.

Contingency Measures. Also to help keep areas on track to timely attainment, the Act unambiguously requires "contingency measures" to go into

effect "if" an area fails to meet pollution reduction requirements. Thus, this Court should join the 9th Circuit in holding unlawful EPA's interpretation that such measures can lawfully consist of measures implemented before the contingency occurred or even before the measures were deemed "contingency measures."

## STANDARD OF REVIEW

At issue is whether EPA's action was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). This Court rejects agency statutory interpretations that are contrary to the "unambiguously expressed intent of Congress." *Chevron U.S.A. v. NRDC*, 467 U.S. 837, 842-43 (1984). If the statute is ambiguous, the agency's interpretation must be rejected under *Chevron* step two if, among other things, "the agency has [not] offered a reasoned explanation for why it chose that interpretation," *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011), or the interpretation "diverges from any realistic meaning of the statute," *Massachusetts v. DOT*, 93 F.3d 890, 893 (D.C. Cir. 1996). Unless otherwise indicated, references in this brief to "unlawful" agency action refer to action that violates *Chevron* step one and is unreasonable under step two.

Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency must give a reasoned explanation for its decisions. *E.g.*, *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996) ("we require the agency to have identified and explained the reasoned basis for its decision.").

## STANDING

Petitioners are national, regional, and local environmental and conservation organizations. They have members who live, work, and recreate in areas governed by the EPA actions challenged herein, including areas designated nonattainment under the 2015 ozone standard. *See* Declarations. EPA's interprecursor trading loophole, inadequate progress requirements, and allowance of toothless contingency measures all waive, weaken, and delay compliance with requirements under the Act for limiting and reducing ozone and ozone-forming pollution associated with serious harms to human health and welfare, thereby prolonging and exacerbating adverse health and welfare threats to Petitioners' members in the above-referenced areas. *See id.*; *e.g.*, *NRDC*, 643 F.3d at 317-19 (petitioner with members in ozone nonattainment areas has standing to challenge EPA weakening of Subpart 2 requirements). The interprecursor trading loophole also harms

Petitioners themselves because it increases the cost of engaging in permitting processes they likely would engage in to protect their members. *See* Berman Declaration ¶ 17(b); *e.g.*, *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093-95 (D.C. Cir. 2015) (organization has standing to challenge agency decision that "injured its interests" and caused it to incur additional costs).

Moreover, EPA's interprecursor trading loophole deprives Petitioners and their members of procedural protections by replacing the statute's bright-line ton-for-ton offset requirement with a complex, flexible approach that is likely to be inconsistently applied and subject to manipulation, making it much harder and more complicated for Petitioners and their members to ensure their health and welfare interests are protected in the permitting process. Similarly, EPA's weak milestone compliance demonstration requirements allow states to wrongfully avoid engaging in additional planning to swiftly reduce harmful pollution emissions in areas where Petitioners' members live, work, and recreate. EPA's actions challenged herein thus further harm Petitioners and their members by depriving them of Act-mandated procedural protections against harms to their health, welfare, and institutional interests. *See* Declarations; *e.g.*, *Nat'l Parks Conserv. Ass'n v. Manson*, 414 F.3d 1, 4-7 (D.C. Cir. 2005) (conservation groups with members in affected area have standing to challenge federal action that alters legal regime governing a state permit decision under Clean Air Act).

Accordingly, Petitioners have standing to pursue this case. Further support for Petitioners' standing appears in the materials cited in this brief and in the declarations attached hereto.

## ARGUMENT

## I.     INTERPRECURSOR TRADING IS ILLEGAL AND ARBITRARY.

### A. The Act unambiguously bars interprecursor trading.

The Act makes clear that, to receive a permit to construct or modify a major source in an ozone nonattainment area, offsetting reductions of ozone-forming precursors must be of the same precursor whose emissions are being offset. The Act specifies that, in marginal areas, to meet "the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increased emissions of such air pollutant shall be at least 1.1 to 1." 42 U.S.C. § 7511a(a)(4). A substantially identical specification applies under other classifications, varying in substance only the ratio.[8] The Act's specification of "such air pollutant" must refer to "volatile organic compounds," not some other pollutant, *id.* § 7511a(a)(4). *E.g.*, *Culbertson v. Berryhill*, 139 S. Ct. 517, 522 (2019) ("the adjective 'such' means '[o]f the kind or degree already described or

---

[8] *Id.* § 7511a(b)(5) (minimum ratio in moderate areas is 1.15:1), (c)(10) (minimum ratio in serious areas is 1.2:1), (d)(2) (default minimum ratio in severe areas is 1.3:1), (e)(1) (default minimum ratio in extreme areas is 1.5:1).

implied.'" (alteration in original)); *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) ("such" means statutory term in Act "quite obviously refers back"). The Act <u>separately</u> extends the offset requirements for volatile organic compounds to oxides of nitrogen—new major sources of oxides of nitrogen must secure oxides of nitrogen offsets at the same ratios as required for volatile organic compounds. 42 U.S.C. § 7511a(f)(1) ("The plan provisions required under this subpart for major stationary sources of volatile organic compounds shall also apply to major stationary sources…of oxides of nitrogen."). Thus, interprecursor trading contravenes the Act by mixing emissions of different ozone-forming pollutants whose emissions the Act expressly requires to be offset separately.

When Congress wanted to allow reductions of one precursor to stand in for reductions in the other, it did so explicitly. It allowed the second progress requirement's mandate for percentage reductions in volatile organic compounds to be met, in whole or in part, with reductions in oxides of nitrogen.[9] *Id.* § 7511a(c)(2)(C). Congress's choice to do so for the second progress requirement confirms that it did not do so for the emission offset requirement. *E.g.*, *Sierra Club v. EPA*, 294 F.3d 155, 160 (D.C. Cir. 2002) ("We cannot but infer from the

---

[9] This requirement applies in serious and higher areas to require an annual average reduction of 3% of volatile organic compounds every three years after the six-year first progress requirement terminates. *Id.* § 7511a(c)(2)(B).

presence of these specific exemptions that the absence of any other exemption…was deliberate, and that the Agency's attempt to grant such a dispensation is contrary to the intent of the Congress."); *NRDC*, 777 F.3d at 468-69.

EPA's interprecursor trading also violates § 7503(c)(1), both by allowing offsets to consist of a different pollutant than the one emitted and by authorizing offsets to be less than the amount of new pollution emitted. The Act's emission offset requirement for "any air pollutant" is satisfied "only by obtaining emission reductions of <u>such air pollutant</u> from the same source or other sources in the same nonattainment area" (with certain irrelevant exceptions), and requires that these "emission reductions…shall assure that <u>the total tonnage of increased emissions of the air pollutant from the new or modified source shall be offset by an equal or greater reduction, as applicable, in the actual emissions of such air pollutant</u> from the same or other sources in the area." 42 U.S.C. § 7503(c)(1) (emphasis added). When a source has major status because of its volatile organic compound emissions, the air pollutant whose emissions are subject to offsetting is "volatile organic compounds," and all instances of "air pollutant" in § 7503(c)(1) mean "volatile organic compounds" (or any precursor thereof). *See id.* § 7602(g) (defining "air pollutant"). When oxides of nitrogen emissions qualify a source as major, "air pollutant" similarly means "oxides of nitrogen." *See id.* §§ 7503(c)(1),

7602(g). Volatile organic compounds and oxides of nitrogen are not the same thing, and neither is a precursor of the other. Accordingly, under the Act's text, the offset requirement for one of these pollutants can only be satisfied by securing at least the same tonnage of reductions in "actual emissions" of the same pollutant.

Further, EPA's interprecursor trading rule allows the total amount of offsetting emission reductions to be <u>less</u> than the increased emissions of the specific pollutant from the new or modified major source. *See* Response to Comments 197 ("neither the final rule nor the [associated Guidance] precludes a state from developing an [interprecursor trading] ratio below 1:1"), JA____. For example, if a marginal area decides to set a trading ratio of 1 ton of oxides of nitrogen for every 2 tons of volatile organic compounds, a source can offset increased emissions of 100 tons of volatile organic compounds (for which the statute requires 110 tons of offsets) with 55 tons of reductions of oxides of nitrogen, which is less tonnage reduced than emitted. *See* 42 U.S.C. § 7511a(a)(4) (establishing offset ratio). Thus, not only does interprecursor trading contravene § 7511a and § 7503(c)(1)'s language by allowing offsetting emission reductions to include reductions of a different pollutant from the one whose emissions must be offset, it also violates § 7503(c)(1)'s express requirement (with emphasis added) that increased emissions of an air pollutant "shall be offset by an <u>equal or greater reduction</u>, as applicable, in the actual emissions of such air pollutant."

## B. EPA provides no rational basis for authorizing interprecursor trading.

Seeking to overcome the statutory text discussed above, EPA argues that the "air pollutant" in § 7503(c)(1)'s definition of the offset requirement is, in this context, "ozone," and read in conjunction with § 7602(g)'s definition of "air pollutant," the term in § 7503(c)(1) encompasses precursors of a pollutant. 83 FR 63,016/2, 63,020/2-21/1, JA____, ____-__; Response to Comments 194-95, 208, 212-13, JA____-__, ____, ____-__. EPA's argument fails for two reasons given above. First, § 7511a specifically and separately identifies each pollutant subject to the offset requirement and requires offsetting emission reductions of "such air pollutant." 42 U.S.C. § 7511a(a)(4), (b)(5), (c)(10), (d)(2), (e)(1), (f)(1). Second, under § 7503(c)(1)'s limitation that "a new or modified major stationary source may comply with any offset requirement in effect under this part for increased emissions of <u>any air pollutant</u> only by obtaining emission reductions of <u>such air pollutant</u>" (emphasis added), "any air pollutant" refers to whichever pollutant (volatile organic compounds or oxides of nitrogen) whose emissions must be offset. EPA thus cannot rationally intermingle the two distinct precursors.[10]

---

[10] Notably, the distinct precursors also react differently in the atmosphere: increased emissions of volatile organic compounds always promote increased ozone; increased emissions of oxides of nitrogen can, under certain conditions and in certain areas, promote decreased ozone levels. Dkt-0118 ("Comments") attach.29 (Technical Comments by Dr. Sahu) 3, JA____. This real-world

EPA irrationally seeks to override the Act's explicit establishment of offset ratios for "volatile organic compounds" by claiming that the offset ratios in § 7511a "stem from the [§ 7503](c) requirement to offset 'increased emissions of any air pollutant' rather than a requirement that specifically identifies the precursor at issue," 83 FR 63,021/1, JA____; Response to Comments 209, JA____. This claim makes no sense on its own terms: the controlling ratios § 7511a(a)-(e) provide plainly are requirements that specifically identify the precursor at issue; and § 7511a(f)(1) extends the ratios to emissions of oxides of nitrogen, thus again and separately specifically identifying the precursor at issue.

EPA's claim also turns statutory interpretation on its head. The agency would have the general control the specific, but, to the contrary, "[it] is a well-established principle of statutory that general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013) (cleaned up).

Again unreasonably interpreting the Act, EPA asserts Congress implicitly supported interprecursor trading under the new source review program by specifically authorizing reductions in emissions of oxides of nitrogen to stand in

difference confirms EPA acted irrationally by allowing one precursor to stand in for the other.

for reductions in emissions of volatile organic compounds under the second progress requirement mandated by § 7511a(c)(2)(C), 83 FR 63,021/1 n.49, 63,021/2-3, JA____; Response to Comments 195, 209 n.31, 212-13, JA____, ____, ____-__. EPA's assertion is the exact opposite of the rational conclusion: § 7511a(c)(2)(C) shows that when Congress wanted to allow such substitution, it said so, and thus that Congress's lack of authorization of it for the new source review program must be given effect. *See, e.g.*, *South Coast I*, 472 F.3d at 894 (generally, "Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another," and EPA's contrary statutory interpretation "cannot be squared with Congress's desire to limit EPA discretion").

EPA further seeks to rationalize its authorization of interprecursor trading as its effort "to strike a balance between providing flexibility for the offset requirement in [new source review] permitting and compliance with the [Act]'s air quality protections." 83 FR 63,018/2, JA____. But EPA has no authority to balance statutory compliance against anything else.[11] And even if there were some

---

[11] *See, e.g.*, *North Carolina v. EPA*, 531 F.3d 896, 910 (D.C. Cir. 2008) ("All the policy reasons in the world cannot justify reading a substantive provision out of a statute."); *New York v. EPA*, 443 F.3d 880, 890 (D.C. Cir. 2006) ("Although EPA might prefer market-based methods of controlling pollution, Congress has chosen a different course with [new source review]."); *Sierra Club*, 294 F.3d at 161 ("An

ambiguity, it is inconsistent with the Act's scheme for EPA to base its interpretation on a goal of increasing discretion for regulators. *See South Coast I*, 472 F.3d at 895 ("EPA's interpretation of the Act in a manner to maximize its own discretion is unreasonable because the clear intent of Congress in enacting the 1990 Amendments was to the contrary."); *see also id.* 886-87 (describing how before 1990, the Act "specified the ends to be achieved but left broad discretion as to the means," and "[t]he 1990 Amendments abandoned the discretion-filled approach of two decades prior in favor of more comprehensive regulation" of ozone pollution).

## C. EPA's rule illegally and arbitrarily allows pollution reductions from years ago to offset new emissions of a different pollutant today.

EPA's rule allows sources to satisfy their offset requirements for one precursor with "banked allowances" of the other precursor. These "banked allowances" are "credits" for permanent emission reductions that occurred before the source applied for a permit to add new emissions. *See NRDC*, 571 F.3d at 1264. In some states, the reductions could have occurred as a result of a source "that shut down or curtailed operations as long ago as 1977." *Id.* Thus, for example, a source applying for a permit in 2019 to emit 200 tons of volatile organic compounds may

---

agency may not disregard 'the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy.'").

seek to satisfy its emission offset requirements by claiming credit for 150 tons of

reduced oxides of nitrogen emissions that resulted from a facility's shutting down

in 1989. The source would be allowed to claim that credit for 150 tons of oxides of

nitrogen reduced 30 years ago will produce a greater ozone benefit now than

securing actual reductions of more than 200 tons of volatile organic compounds

today.

In allowing new sources to claim offset credit for reductions of a different

pollutant that occurred years ago, EPA's rule violates the Act's express mandate

that new source emissions "shall be offset" by an equal or greater reduction in

"actual emissions of such air pollutant." 42 U.S.C. § 7503(c)(1). The plain meaning

of "actual" is "[r]eal; substantial; existing presently in fact; having a valid

objective existence as opposed to that which is merely theoretical or possible."

*Black's Law Dictionary* 34 (6th ed. 1990) (emphasis added); *accord, e.g.*,

*American Heritage College Dictionary* 14 (3d ed. 1997) ("Existing and not merely

potential or possible…. Being, existing, or acting at the present moment;

current."); *NRDC*, 571 F.3d at 1278-79 (Rogers, J., concurring in part and

dissenting in part) (citing similar definitions of "actual" as meaning "'existing or

occurring at the time'" (emphasis in original)). Thus, by definition, "actual

emissions of such air pollutant" cannot include emissions of a different air

pollutant that no longer exist at the time a source applies for its permit under the

new source review program. *NRDC*, 571 F.3d at 1278-79 (Rogers, J., concurring in part and dissenting in part).[12] Likewise, § 7503(c)(1)'s mandate that new emissions "shall be offset" is violated when new emissions of a pollutant are being poured into the air without any contemporaneous reduction of the same pollutant. And allowing emissions of, say, volatile organic compounds to increase without a contemporaneous reduction in volatile organic compound emissions will make attainment of the ozone standard more difficult, *see* Dkt-0040 at 2 (explaining how permitting banked allowances' use in interprecursor trading is inconsistent with purpose of offsets), JA____, a harm that is not avoided merely because another source reduced its oxides of nitrogen emissions years before.

EPA's action allowing banked allowances' use in interprecursor trading is also arbitrary. As EPA itself agrees, the way ozone forms in an area changes from one time to another, meaning that the impact of changes in precursor emissions on ozone formation "can vary from day to day or even hour to hour in a given area." Guidance 3, JA____. Commenters explained to EPA that because conditions can shift over time and place, there is no basis for finding that credits from reductions of one ozone precursor years (or even decades) ago will provide the same ozone

---

[12] At issue in *NRDC* was the legality of using banked allowances in any situation. The majority did not reach the merits of this issue, finding it time-barred. 571 F.3d at 1265-66.

reduction benefit as emission reductions of a different pollutant today. Dkt-0118

("Comments") 43, JA____; *see* Dkt-0040 at 2 (because credits "were banked in the

past, when the atmosphere was different, the issue arises of how much those credits

should be counted in today's atmosphere with its changed chemistry; they may be

more effective or less effective at reducing ozone"), JA____; *see also* Comments

attach.29 (Technical Comments by Dr. Sahu) 2 (EPA has said that key number

underlying equivalency determination "can vary widely in time and space"),

JA____.

EPA asserts that states can mitigate these concerns by using conservative

assumptions in their technical analyses, Response to Comments 224, JA____, but

provides no rational or real world showing how the use of banked credits from

reductions of one pollutant years ago can produce greater ozone benefits today

than actual emission reductions of a different pollutant today. *See* Guidance

(outlining the hard-to-solve science of ozone formation and complex

methodologies for developing trading ratios), JA____; Dkt-0040 at 2 ("This

intertemporal aspect of offsetting is more poignant for [interprecursor trading] than

for normal single-precursor offsetting, since considering the chemistry is central to

[interprecursor trading], but need not be considered for normal offsetting."),

JA____. EPA's failure to rationally respond to the comments and to provide a

rational explanation renders its decision arbitrary. *E.g.*, *U.S. Sugar Corp. v. EPA*,

830 F.3d 579, 628-30, *amended in unrelated part on reh'g*, 844 F.3d 268 (D.C. Cir. 2016) (EPA action arbitrary because "not adequately explained" and "EPA failed to directly consider and respond to several comments" that identified flaws in its approach); *Del. Dep't of Natural Res. v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015) (EPA action arbitrary because it both failed to "respond to serious objections" and "seems to have either intentionally discounted [a later comment] or simply confused the later comment for the earlier one"); *Ass'n of Private Sector Colleges v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012) (agency may have "misinterpreted the concerns raised by the comments to be limited," and its "'failure to address these comments, or at best its attempt to address them in a conclusory manner, is fatal to its defense'").

### D. EPA's authorization of interprecursor trading violates the Act's anti-backsliding provision and is arbitrary.

Before the 2015 Implementation Rule, EPA's regulations did not authorize interprecursor trading to satisfy ozone offset requirements. *See* Response to Comments 211, 215, JA____, ____; 81 FR 81,276, 81,295/2 (Nov. 17, 2016) (characterizing 2015 Rule action and reconsideration petition), JA____. Afterward, EPA's regulations did. 80 FR 12,289/1 (explaining that EPA amended regulatory text to avoid the reasonable interpretation that prior language "could be read to limit interprecursor trading to [fine particulate matter], and thus to preclude this

kind of interprecursor trading for ozone precursors"), JA____. Simultaneously, EPA revoked the 1997 standard, an action that triggered § 7502(e)'s anti-backsliding protection. *See, e.g.*, *South Coast II*, 882 F.3d at 1147; *NRDC*, 571 F.3d at 1271. Regulations that govern the new source review program are subject to § 7502(e). *NRDC*, 571 F.3d at 1271. They thus cannot lawfully be made "'less stringent' than the existing requirement." *Id.* By amending the new source review regulations to allow construction or modification of a major source that will increase more of a pollutant than previously allowed, EPA has weakened the regulations. *See* 83 FR 63,018/2 (EPA's authorization of interprecursor trading represents a "balance between providing flexibility…and compliance with the [Act's] air quality protections"), JA____. EPA's weakening protections violates § 7502(e). *NRDC*, 571 F.3d at 1271.

EPA's two responses fall flat. First, the agency contends that § 7502(e) does not apply here. 83 FR 63,021/1-2, JA____; Response to Comments 211, JA____. To the contrary, at issue here is EPA's changes to its new source review regulations when it revoked the 1997 ozone standard and its reconsideration of those changes. *See, e.g.*, Response to Comments 211, 215, JA____, ____. As explained above, § 7502(e) applies in this circumstance. Second, EPA claims its regulatory changes are not a weakening because they purportedly change nothing. 83 FR 63,021/2 ("the [interprecursor trading] approach outlined in the proposal

and being finalized here represents the longstanding policy of the EPA."), JA____.

EPA's own statements belie this claim. The agency acknowledges that regulatory

changes it made in 2008 apparently "superseded" its prior allowance of

interprecursor trading, "making it <u>necessary</u> to add an [interprecursor trading

provision] for ozone." Response to Comments 211 (emphasis added), JA____.

Moreover, in 2015, under § 7607(d)(7)(B), EPA granted a petition for

reconsideration of its amendment of its regulations that allowed interprecursor

trading. Letter from McCabe to Baron, JA____. EPA's decision to grant

reconsideration confirms its amendment worked a change.

## II. EPA'S RULE UNLAWFULLY AND ARBITRARILY ALLOWS AREAS TO AVOID EMISSION REDUCTIONS REQUIRED BY THE ACT'S REASONABLE FURTHER PROGRESS PROVISIONS.

Congress mandated that states reduce emissions of ozone-forming pollutants

in moderate or higher nonattainment areas by set percentages compared to their

actual emissions in a fixed baseline year. Under the first progress requirement,

moderate and higher areas must reduce their emissions of volatile organic

compounds by 15% "from baseline emissions" within six years of an identified

baseline year, with "baseline emissions" defined as the "actual" amount of

emissions of ozone-forming pollutants from human "sources in the area during"

the baseline year.[13] 42 U.S.C. § 7511a(b)(1)(A)(i), (b)(1)(B). The second progress requirement applies in serious and higher areas; it begins on the deadline for completion of the first progress requirement and mandates the equivalent[14] of 3% annual reductions "from the [same] baseline emissions" of volatile organic compounds, averaged over every three years, until attainment. *Id.* § 7511a(c)(2)(B)-(C). Serious and higher areas must demonstrate compliance with the progress requirements' "milestones," with statutorily prescribed consequences if they fail to pass. *Id.* § 7511a(g). As explained below, EPA illegally and irrationally loosened these requirements.

### A. EPA unlawfully and arbitrarily allows milestones to be deemed met even if the required "actual" emission reductions do not occur.

EPA agrees that the progress requirements are "grounded in terms of actual emissions." Response to Comments 71, JA____. Yet EPA allows serious and higher areas to claim compliance with their milestones by showing either (1) that

---

[13] When EPA has approved an area's plan to meet this requirement under a prior ozone standard, EPA allows the 15% reduction requirement to be met with a mix of volatile organic compound and oxides of nitrogen reductions that equates, in terms of effectiveness at reducing ozone formation, to 15% reduction in volatile organic compound emissions. 83 FR 63,004/3, JA____. This Court has upheld EPA's approach. *South Coast II*, 882 F.3d at 1153.

[14] Oxides of nitrogen reductions may be substituted for volatile organic compound reductions. *Id.* § 7511a(c)(2)(C).

enough of the control measures in the state's plan to meet the progress requirement have been implemented that should cover the necessary reductions ("implementation-based approach") or (2) that actual emissions decreased by the required amount ("actual emissions approach"). 83 FR 63,011/2-3, 63,035/1 (codified at 40 C.F.R. § 51.1310(c)(2)), JA____, ____. Only the actual emissions approach is lawful and rational under the Act.

The Act defines the progress requirements in terms of reductions from "baseline emissions." 42 U.S.C. § 7511a(b)(1)(A)(i), (c)(2)(B). It further defines "baseline emissions" to "mean[] the total amount of <u>actual</u> VOC or $NO_X$ emissions from all anthropogenic sources in the area" in the baseline year, with exceptions not relevant here. *Id.* § 7511a(b)(1)(B) (emphasis added). Thus, the Act defines the progress requirements in terms of "actual" emissions, and the progress requirements can only be satisfied by actual emission reductions. Accordingly, a showing of actual emission reductions is necessary, for, even if control measures in a state's plan are implemented, numerous factors can undercut the projected emission reductions from the plan. *See* Thomas O. McGarity, *Missing Milestones: A Critical Look at the Clean Air Act's VOC Emissions Reduction Program in Nonattainment Areas*, 18 Va. Envtl. L.J. 41, 59 (1999) (Comments attach.24) (EPA recognizes that "regulatory requirements usually did not work as well in the real world as on paper"), JA____.

For example, growth in emissions from new or modified stationary sources not subject to new source review (like relatively small oil or gas production facilities) or from other sources not subject to control measures may outpace projections. *See* EPA-HQ-OAR-2003-0079-0849 ("Inspector General Report") ii (in making plans to meet progress requirements, "States may have used inaccurate data, assumptions, and projections of emission growth, resulting in fewer reductions planned than appropriate," and providing example), JA____.[15] Projected reductions from implementation may prove overly optimistic. Inspector General Report 20 (one emission control program "projected VOC emission reductions based on an assumption of 100-percent effectiveness, whereas program records show that their…program was only 81-percent effective"), JA____; *see* McGarity 94 (some projected reductions "depended upon assumptions and predictions that were essentially unverifiable" when EPA approved plan), JA____. Or projected emission reductions from implemented control measures may fail to result, like if people replace older, more polluting motor vehicles with newer, cleaner ones more slowly than expected. Only examination of actual emissions will reveal whether the needed reductions actually occurred. *See* Inspector General Report 45 ("The use of indicators alone will not fully meet the Act's requirement that States

---

[15] *See also, e.g.*, Comments 1 n.1, 38 (citing Inspector General Report and incorporating by reference all documents cited in Comments), JA____, ____.

demonstrate the attainment of specific, mandated precursor emission reductions for each nonattainment area."), JA____; McGarity 101 ("The milestones program of the 1990…amendments was designed to force the EPA and the states to" "take a hard look at the progress that we have made, to identify erroneous projections, isolate unsuccessful programs, and take actions necessary to fix or replace them"), JA____.

The Act's purpose and legislative history confirm that only the actual emissions approach is lawful. Congress sought to bar bureaucratic exercises that did not actually result in emission reductions. H.R. Rep. No. 101-490 pt.1, at 229 (1990), *reprinted in* 2 A Legislative History of the Clean Air Act Amendments of 1990 ("Legislative History") 3253 (1993) ("The objective is to achieve the standard as early as possible with effective and enforceable measures and without gaming by the States, industry, and others."); 1 Legislative History 789 (statement of Sen. Mitchell) ("One of the problems that has plagued the Clean Air Act is the 'gaming' that has continued in the form of paper trails starting everywhere and leading to no emissions reductions."). In explaining the need for amending the Act, it highlighted that plans for emission reductions "were not always being enforced or were not as effective as anticipated," and that uncertainties and assumptions baked into the plans "may have led to inaccuracies in the ozone plans." H.R. Rep. No. 101-490 pt.1, at 147, *reprinted in* 2 Legislative History 3171.

Congress created the milestone program to make the progress requirements more effective at obtaining actual reductions, explaining that, under it, "areas will be required to track their progress, and to take timely corrective action to compensate for any emission reduction shortfall." *Id.* 246, *reprinted in* 2 Legislative History 3270; *see also id.* ("This system is intended to assure that such areas remain on track toward attainment of the standard by the applicable deadline, and that those areas falling behind their emission reduction timetable learn of their shortfall as quickly as possible, and have an early opportunity to take corrective action."). Indeed, in a Conference Report provided by Sen. Baucus, Congress made clear that inventories of actual emissions would be determinative of whether an area met its progress obligations. 1 Legislative History 1002 (emission "inventories would be required" at same time as first progress requirement comes due). As milestone compliance determinations are when EPA is supposed to verify that serious and higher areas are meeting the requirements for reductions in actual emissions, the milestone compliance determinations must also depend on actual emissions. Foregoing this demonstration thwarts Congress's intent that polluted areas' progress be kept on track. *See* McGarity 97 ("Congress went to great lengths to provide an accountability vehicle in the 1990 amendments by requiring states to demonstrate after-the-fact that the milestones had been achieved"), JA____.

EPA's own historical interpretation of the milestone compliance requirements confirms that areas must show compliance with actual emissions. Only 18 months after enactment of the Clean Air Act Amendments of 1990, EPA explained that "[milestone] demonstrations are due 90 days after each milestone was to have been achieved and <u>shall</u> be submitted as an areawide inventory of actual emissions." 57 FR 13,498, 13,518/1-2 (Apr. 16, 1992) (emphasis added), JA____.

EPA makes three arguments for allowing areas to demonstrate compliance without showing their actual emission reductions have complied with the statutory milestones. None has merit. First, EPA relies on the Act's direction to it to establish the "form and content" of a compliance demonstration. *E.g.*, 83 FR 63,011/2, JA____. Whatever discretion EPA has, it is limited by other provisions of the Act. *See Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 861 (D.C. Cir. 2006) (rejecting interpretation that "elevate[s] one provision of the [statute] over another"); *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1314 (D.C. Cir. 2004) (statutory provision requiring agency to adopt environmental impact study "to the extent practicable" "cannot reasonably be interpreted to permit [agency]" to rely on study "that does not meet the [governing] substantive requirements"). As explained above, the progress requirements are measured as percent reductions from actual emissions, meaning that assessing compliance with

the requirements necessitates knowing what the actual emissions are. As commenters explained, EPA's implementation-based approach overlooks important considerations like the possibility of emissions growth that the state implementation plan doesn't control or an implemented plan that simply proves ineffectual at reducing emissions. Comments 31-32, JA____-__. EPA made no substantive response. *See* Response to Comments 71-73, JA____-__. EPA arbitrarily did not consider these flaws in its implementation-based approach and has no explanation for how that approach will actually meet the statutory requirement that the progress requirements be measured in terms of actual emissions. *E.g.*, *U.S. Sugar*, 830 F.3d at 628-30 (EPA acted arbitrarily where it "failed to directly consider and respond to several comments" that identified flaws in its approach); *Mountain Communic'ns v. FCC*, 355 F.3d 644, 648-49 (D.C. Cir. 2004) (agency action arbitrary because agency "has not even tried to explain how its position can be reconciled with the statutory provision"); *Transactive*, 91 F.3d at 236 ("we require the agency to have identified and explained the reasoned basis for its decision.").

Second, EPA seems to contend that the purportedly short statutory timeframe for submitting milestone demonstrations supports the implementation-based approach because actual emissions data from the statutorily-required emissions inventory may not be available fast enough. *See* Response to Comments

68-69, JA____-__; 83 FR 63,011/2, JA____. But, as EPA made clear in the proposal, any conflict between developing the emissions inventory and the milestone demonstration submission schedule is a function of EPA's discretionary regulatory choice to "provide no less than 12 months for states to report annual emissions after the end of the calendar year." 81 FR 81,293/1, JA____. Accordingly, EPA's alleged timing problem is illusory: this Court has already held that where there is a conflict between what EPA's rules allow and what the statute requires, the statute governs. *See, e.g.*, *South Coast I*, 472 F.3d at 903 ("EPA must determine its procedures <u>after</u> it has identified what findings must be made under the Act." (emphasis in original)).

Third, EPA touts that the implementation-based approach is "consistent" with its approach to milestones for a different pollutant, fine particulate matter, which is regulated under another subpart of the Act. 83 FR 63,011/2, JA____; Response to Comments 68, JA____. But the statute's command for the milestones for fine particulates calls for states to develop their own "quantitative milestones," without specifying what those milestones must be measured as. 42 U.S.C. § 7513a(c)(1). By contrast, as explained above, Congress mandated how the milestones for ozone would be measured: as actual emissions. By making the ozone milestones demonstration consistent with the meaningfully different statutory provision § 7513a(c)(1), EPA unlawfully and arbitrarily treats dissimilar

provisions similarly without rational explanation. *See, e.g.*, *McFadden v. United States*, 135 S. Ct. 2298, 2306 (2015) (rejecting argument that "ignores an important textual distinction between" two statutes); *Emera Maine v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017) (rejecting agency action that "failed to recognize" that two statutory sections mandate different "burden[s] of proof"); *U.S. Sugar*, 830 F.3d at 650-51 (EPA failed to rationally explain why its conclusion for one category of sources "could be identically applied" to another that appeared significantly different in important ways).

## B.     EPA unlawfully and arbitrarily allows states to choose their own baseline year.

EPA allows areas subject to the progress requirements to pick between two possible years as the baseline year from which the progress requirements' percentage reductions are calculated. 83 FR 63,034/3 (codified at 40 C.F.R. § 51.1310(b)), JA____. Just last year, this Court rejected EPA's attempt in the 2015 Rule to allow areas to select an "alternative baseline year" because the agency "failed to provide a statutory justification." *South Coast II*, 882 F.3d at 1152. EPA illegally and irrationally failed to do so in the 2018 Rule, too.

The Act does not authorize states to exercise discretion over their own baseline year. To the contrary, the Act's plain text specifies only one baseline year, without any hint that states have any discretion over it. *See* 42 U.S.C.

§ 7511a(b)(1)(B) ("'baseline emissions' means the total amount of actual VOC or NO$_X$ emissions from all anthropogenic sources in the area during the calendar year 1990...."). Moreover, Subpart 2 is specifically designed to minimize discretion. *South Coast I*, 472 F.3d at 887; *see Whitman*, 531 U.S. at 484 ("The principal distinction between Subpart 1 and Subpart 2 is that the latter eliminates regulatory discretion that the former allowed.").

When Congress wanted to allow variation in implementing ozone standards, it did so expressly. For example, Congress explicitly provided for adjustment of the baseline used in § 7511d's fees control. 42 U.S.C. § 7511d(b)(2) (establishing default "baseline amount" as specific amount of emissions "during the attainment year" but also authorizing EPA to allow "baseline amount to be determined" as average amount of specific emissions "determined over a period of more than one calendar year"). Congress also specified that, if an area is reclassified, EPA can adjust some deadlines under certain circumstances. *Id.* § 7511a(i). Congress did not provide for such variation in the baseline year for the progress requirements, and that choice must be given effect. *E.g.*, *NRDC*, 777 F.3d at 468-69; *Sierra Club v. EPA*, 705 F.3d 458, 467-68 (D.C. Cir. 2013).

The agency identifies nothing in the Act that would authorize a state to choose its own baseline year. EPA relies instead on a potential "increase[d] resource burden" from having "a single fixed...baseline year," 83 FR 63,006/1,

JA____, and on a desire "to provide air agencies with flexibility," Response to Comments 36-38, 40-43, JA____-__, ____-__, but those are extra-statutory considerations, just like its earlier flexible approach relied on. *South Coast II*, 882 F.3d at 1153. Moreover, Congress amended the Act in 1990 because the prior "discretion-filled approach" to ozone cleanup "had proven unsuccessful." *South Coast I*, 472 F.3d at 887. EPA's desire to "provide…flexibility" thus contravenes this Court's holding that EPA cannot lawfully interpret the Act in a way that contradicts "the clear intent of Congress in enacting the 1990 Amendments." *South Coast I*, 472 F.3d at 895; *e.g.*, Response to Comments 36, JA____.

EPA's rationale further irrationally relies on the non sequitur that because that the baseline year provision is ambiguous about what the baseline year is, EPA can allow states to select between options flowing from reasonable statutory interpretations, 83 FR 63,055/3, JA____. The premise is valid, per *South Coast II*, 882 F.3d at 1152, but it says nothing about whether the Act is ambiguous about whether EPA can leave it up to states to choose their own baseline year. *See Chevron*, 467 U.S. at 842 ("First, always, is the question whether Congress has directly spoken to the <u>precise question at issue</u>." (emphasis added)). EPA does not explain its logical leap to its groundless conclusion that states can choose. *See Good Fortune Shipping v. Comm'r of Internal Revenue Serv.*, 897 F.3d 256, 266

(D.C. Cir. 2018) (even if premise of agency action is reasonable, conclusion "does not follow," and thus agency action is "invalid").

### III. EPA UNLAWFULLY ALLOWS STATES TO RELY ON ALREADY-IMPLEMENTED CONTROLS AS CONTINGENCY MEASURES.

The Act requires implementation plans for moderate and higher areas to "provide for the implementation of specific measures <u>to be undertaken if</u> the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date," with these measures included in a state's implementation plan "as <u>contingency</u> measures <u>to take effect in any such case</u>" automatically. 42 U.S.C. § 7502(c)(9) (emphasis added); *accord id.* § 7511a(c)(9) (requiring serious and higher areas' plans to "provide for the implementation of specific measures <u>to be undertaken if</u> the area fails to meet any applicable milestone" with these measures included in a state's implementation plan "as <u>contingency</u> measures <u>to take effect without further action by the State or Administrator upon a failure</u> by the State to meet the applicable milestone" (emphasis added)); *see also id.* § 7511a(e)(5)(B) (in extreme areas that rely on technological developments to attain timely, requiring similar contingency measures to be implemented if the technologies are not as effective as planned). This statutory language is unambiguously future-facing and conditional: as the 9th Circuit held, "contingency" unambiguously "means 'a possible future event or

condition or an unforeseen occurrence that may necessitate special measures.'"

*Bahr*, 836 F.3d at 1235 (quoting *Webster's Third New International Dictionary* (2002)).[16]

Further, the Act requires these "contingency measures" "to be undertaken if" an area fails to make required pollution reductions, "to take effect in" certain situations, and "to take effect…upon" a specific event's occurring. 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9); *see also id.* § 7511a(e)(5)(B) (requiring certain "contingency measures to be implemented…if" certain developments fail to occur). All these phrases signify that the measures are to start in the event that certain conditions obtain. *Bahr*, 836 F.3d at 1236 (construing § 7502(c)(9)); *State Farm Fire & Cas. v. United States*, 137 S. Ct. 436, 443 (2016) ("if" is "clear[] conditional word[]"); *Dodd v. United States*, 545 U.S. 353, 358 (2005) ("the definition of 'if' is 'in the event that' or 'on condition that'" (quoting *Webster's Third New International Dictionary* 1124 (1993)); *Del. Dep't of Natural Res. v. EPA*, 895 F.3d 90, 98 (D.C. Cir. 2018) (word "upon" in Subpart 2 provides "a

---

[16] *Accord, e.g.*, *Black's Law Dictionary* 320 ("Something that may or may not happen."); *Webster's New Universal Unabridged Dictionary* 395 (deluxe 2d ed. 1983) ("the quality or condition of being contingent" or "something whose occurrence depends on chance or uncertain conditions"); *see also Black's Law Dictionary* 321 (defining "contingent" as "conditioned upon the occurrence of some future event which is itself uncertain"); *Webster's New Universal* 395 (defining "contingent" as "dependent (on or upon something uncertain); conditional" (emphases removed)).

conditional context"); *see Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 312 (2014) (EPA promulgated rule "to take effect" in future); *United States v. Verrusio*, 762 F.3d 1, 18-19 (D.C. Cir. 2014) (construing "to be performed" as having a future orientation).

Measures that have already been implemented do not fit within this unambiguous statutory meaning. They are not measures that are to be implemented if a condition comes to pass. They are instead just measures that, in conjunction with others, failed to bring the area to make reasonable further progress toward attainment or to timely attain. EPA even claims authority to approve as contingency measures controls that were adopted and fully implemented even <u>before</u> the state implementation plan was submitted or approved. *Bahr*, 836 F.3d at 1226-27; *see* 83 FR 63,026/2-3 (refusing to follow *Bahr* outside 9th Circuit), JA____. Even if the Act were ambiguous about whether some contingency measures could be implemented before they are triggered, measures that are implemented even before submission cannot be rationally reconciled with the Act.

Indeed, contingency measures that have already been implemented provide no incentive for states to do more to reduce ozone-forming emissions. For contingency measures, numerous states rely on emission reductions resulting from already-implemented federal limits on engine emissions. *See, e.g.*, 83 FR 49,297 (Oct. 1, 2018) (approving Connecticut's contingency measures), JA____; EPA-

R01-OAR-2016-0168-0022 at 117 (Connecticut proposes its "contingency plan requirement will be met by using a portion of the projected NO$_X$ emission reductions occurring between 2011 and 2017 from federal standards for non-road engines and equipment"), JA____. But reliance on such already-implemented measures cannot be reconciled with *South Coast I*, which explains that contingency measures promote emission reductions <u>now</u> by promising accountability for areas that fail to sufficiently curb emissions. 472 F.3d at 904 (even before being triggered, contingency measures are "controls" because they are like the Act's penalty fee provision); *see also id.* 903 ("As Congress set the penalty deadline well into the future, giving states and industry ample notice and sufficient incentives to avoid the penalties, they were 'applicable' before they actually were imposed.").

Contending that the Act is ambiguous about whether contingency measures can consist of nothing more than measures that are already implemented, EPA relies principally on the 5th Circuit's decision in *LEAN*, 382 F.3d 575. 83 FR 63,026/2-3, JA____. But *LEAN* ascribes ambiguity to the Act simply because it doesn't affirmatively prohibit reliance on already-implemented measures as contingency measures. 382 F.3d at 583. This Court has repeatedly rejected finding that a statute is ambiguous merely because it does not <u>expressly</u> negate all that it forecloses. *E.g.*, *NRDC v. EPA*, 749 F.3d 1055, 1064 (D.C. Cir. 2014); *Rwy. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc).

Rather, as the *LEAN* Court acknowledged, "a plain reading" of the Act "would seemingly preclude the use of past reductions which have already failed to achieve attainment." 382 F.3d at 583. "[T]hat is the end of the matter." *Chevron*, 467 U.S. at 842; *accord Performance Coal Co. v. Fed. Mine & Health Rev. Comm'n*, 642 F.3d 234, 238-39 (D.C. Cir. 2011); *see also Bahr*, 836 F.3d at 1236 ("Having determined that the 'plain reading of the terms' indicates a forward looking approach, the Fifth Circuit was bound by *Chevron* to give effect to the plain meaning of the statute.").

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court vacate the challenged portions of the rules. They are severable from the remainder of the rules, which set out other implementation provisions and should be left in place. *South Coast*, 489 F.3d at 1248 ("complete vacatur of a partially valid rule would only serve to stall progress where it is most needed."); *Davis County Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459-60 (D.C. Cir. 1997).

DATED:     July 22, 2019          Respectfully submitted,

/s/ Seth L. Johnson
Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2243
(202) 667-4500
sjohnson@earthjustice.org

*Counsel for Petitioners*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Counsel hereby certifies, in accordance with Federal Rules of Appellate Procedure 32(a)(7)(B)(i) and (g)(1), that the foregoing **Proof Opening Brief of Petitioners**, contains 12,032 words, as counted by counsel's word processing system, and thus complies with the 13,000 word limit.

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) & (a)(6) because this document has been prepared in a proportionally spaced typeface using **Microsoft Word 2016** using **size 14 Times New Roman** font.

DATED: July 22, 2019

/s/ *Seth L. Johnson*
Seth L. Johnson

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of July, 2019, I have served the

foregoing **Proof Opening Brief of Petitioners**, including the Addendum thereto,

on all registered counsel through the court's electronic filing system (ECF).


/s/ *Seth L. Johnson*
Seth L. Johnson